762 P.2d 519

**STATE of Arizona, Appellee,**

v.

**Donald Edward BEATY, Appellant.**

**No. 6643.**

Supreme Court of Arizona,
In Banc.

May 5, 1988.

As Amended on Grant of Reconsideration
Nov. 1, 1988.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, R. Wayne Ford, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Stephen M.R. Rempe, Edward F. McGee, Asst. Deputies Maricopa County Public Defender, Phoenix, for appellant.

CAMERON, Justice.

## I. JURISDICTION

Defendant Donald Edward Beaty appeals from verdicts and judgments of guilt for the crimes of first-degree murder (A.R.S. § 13–1105(A)(1)) and sexual assault (A.R.S. § 13–1406). Defendant also seeks review of the denial of his petition for post conviction relief, Ariz.R.Crim.P. 32, alleging ineffective assistance of counsel.

We have jurisdiction pursuant to Ariz. Const. art. 6 § 5(3) and A.R.S. §§ 13–4031, –4033, and –4035.

## II. QUESTIONS

We must answer the following issues:

1. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN REFUSING TO EXCLUDE TESTIMONY OF DEFENDANT'S STATEMENTS TO DR. O'CONNOR BECAUSE:

 a. *The statements were protected by the physician-patient privilege?*

 b. *The statements were not voluntarily made?*

 c. *The statements were made in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1062, 16 L.Ed.2d 694 (1966)?*

2. DID THE TRIAL COURT ERR IN DENYING DEFENDANT'S MOTION IN LIMINE TO BAR THE ADMISSION OF PHOSPHOGLUCOMUTASE (PGM) TEST RESULTS?

3. DID THE TRIAL COURT ERR UNDER A.R.S. § 13–703(D) IN IMPOSING THE DEATH PENALTY?

4. DID THE TRIAL COURT ERR IN CONSIDERING VICTIM IMPACT EVIDENCE AT THE SENTENCING PHASE OF THE TRIAL?

5. DID THE TRIAL COURT ERR IN IMPOSING CONSECUTIVE SENTENCES FOR MURDER AND SEXUAL ASSAULT?

6. DID THE TRIAL COURT ERR BY FAILING TO STATE ON THE RECORD OR IN ITS SPECIAL VERDICT THAT IT FOUND THE EXISTENCE OF AGGRAVATING FACTORS TO HAVE BEEN PROVEN BEYOND A REASONABLE DOUBT?

7. IS ARIZONA'S DEATH PENALTY STATUTE A.R.S. § 13–703 UNCONSTITUTIONAL BECAUSE:

 a. *The statute fails to require the trial court to support its findings in the special verdict?*

 b. *The statute fails to require the prosecution to prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors?*

 c. *The statute mandates that a death sentence be imposed whenever the court finds one aggravating and no mitigating circumstances regardless of the trial court's belief that a death sentence is unwarranted under the facts of the case?*

 d. *The statute allows inadequate standards to be utilized by the trial court in balancing aggravating circumstances against mitigating circumstances?*

 e. *The appellant is denied his sixth amendment right to a jury trial on the issues of the existence or nonexistence of both aggravating and mitigating circumstances as well as on the issue of the propriety of a death sentence?*

8. WAS THE DEATH PENALTY IN THIS CASE PROPORTIONAL TO OTHER DEATH SENTENCES FOR CRIMES OF A LIKE NATURE?

9. WAS DEFENDANT'S MOTION FOR POST CONVICTION RELIEF DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL PROPERLY DENIED?

## III. FACTS

The victim, Christy Ann Fornoff, a 13–year–old female newscarrier for the *Phoenix Gazette*, disappeared on 9 May 1984 while attempting to collect her newspaper accounts at the Rock Point Apartments in Tempe, Arizona. The victim's mother had accompanied her and waited outside the apartment complex while the victim went inside. The victim did not return. A search of the apartment complex took place. The victim's collection book was discovered by a fence near the complex, but the victim was not found.

Two days later, Donald Edward Beaty, the defendant and resident maintenance manager at the apartment, reported to the Tempe police that he had found the victim's body near a trash container in the parking lot of the apartment complex. The body was wrapped in a white sheet. Evidence was collected, including pubic hairs and fibers that were consistent with the pubic hairs of the defendant and fibers found in the apartment of the defendant. There was also a vomit-like substance on the victim's face and the sheet which matched vomit found in defendant's apartment. From the autopsy it appeared that the victim lost consciousness due to asphyxiation and never regained it before she died. The autopsy also indicated that the victim was sexually assaulted either contemporaneous with or shortly after death.

Defendant's first trial began 29 January 1985 and ended on 18 March 1985 with a mistrial when the jury was unable to arrive at a unanimous verdict. The defendant's second trial began on 8 May 1985 and ended on 20 June 1985. Retrial involved most of the same evidence presented in the first trial, some additional evidence and the testimony of Dr. George O'Connor, given over defendant's objection.

The jury convicted defendant of one count of first-degree murder and one count of sexual assault. The trial judge imposed the death penalty for murder finding one aggravating circumstance and no mitigating circumstances. A.R.S. § 13–703. The judge also imposed an aggravated, enhanced sentence of 28 years imprisonment for the sexual assault. The court then ordered that the latter be served consecutively to the sentence imposed on the murder count. At the sentencing phase of the trial, the judge received victim impact statements from various sources.

After filing a notice of appeal, the defendant filed a petition for post conviction relief, pursuant to Ariz.R.Crim.P. 32, alleging ineffective assistance of counsel at trial. The appeal was stayed pending the outcome of the Rule 32 proceeding. Ariz. R.Crim.P. 31.4(a)(1). The trial court denied relief and defendant petitioned this court for review. The appeal and the petition for review were consolidated pursuant to Ariz. R.Crim.P. 31.4(b)(2).

## IV. ISSUES

### 1. ADMISSIBILITY OF DR. O'CONNOR'S TESTIMONY

Dr. O'Connor is a psychiatrist employed by the Maricopa County Jail which houses adult inmates. He first contacted the defendant shortly after his arrest as part of a routine check on the prisoners. Dr. O'Connor referred the defendant for orthopedic surgery on his foot and prescribed pain medication. No major psychiatric problems were noted.

In August, the defendant was transferred from the main jail to the hospital unit at Durango. The transfer was made partly because prison officials thought that his foot would heal better at Durango, where he would have access to an outside yard where he could exercise. Dr. Jack Potts, also a psychiatrist, was to be his treating physician for the foot injury. The move was also made to put him in an area where his safety could be better protected because he was being harassed by other prisoners at the main jail.

Defendant was not transferred to receive psychiatric treatment. Even though the Durango facility offered group therapy sessions and individual counseling sessions on Mondays, Wednesdays and Fridays, defendant did not attend these sessions.

The defendant did, however, participate in group counseling sessions involving five

women and four other men on Tuesdays and Thursdays. The purpose of these sessions was to see if by bringing prisoners closer together they would not see each other as sex objects, but rather as human beings and become more respectful toward one another. The facility had previously had problems with inmates creating disturbances by yelling profanities back and forth. The defendant was asked to volunteer because he had been displaying adolescent-type behavior toward the female inmates. The group was experimental and organized as a research project for Dr. O'Connor, although the leaders hoped it would be beneficial to the participants. Dr. O'Connor testified that he was not treating the defendant in particular during the sessions. Rather, it was a group activity for all ten people. Testimony during the trial revealed that:

A. [By Dr. O'Connor] In the jail, most of the male inmates tend to become extremely lax in their attitudes, especially their behavior when they are around female staff members, personnel and other female inmates that they may meet going back and forth to Court. They can get quite vulgar and profane.

It was our hope to experiment and see if we brought them into a closer proximity, closer contact, that they could then start to have a feeling that, indeed, that that was not simply a sex object over there but a human being, and become more respectful.

What we were hoping to show was that the consequence to that type of group activity, there [would] be a great assemblance of respect and dignity in our unit, and we were hoping to extrapolate that to the entire jail.

\* \* \* \* \* \*

Q. [By Mr. Thurston] Your testimony is that it was or wasn't treatment? What were you treating Mr. Beaty for?

A. I wasn't treating Mr. Beaty in particular at that particular time. It was a group activity for all ten of the people.

Prior to participating in this group counseling, the defendant signed a document entitled:

"Interpersonal Relationships
Group Contract"

Please read the following guidelines and sign below.

1. I will attend each group meeting unless I have other "official" committments e.g. court because I am an important part of this group; I AM this group.

2. I have the ability to observe my own behavior; I can distinguish my actions as [appropriate] or inappropriate. Should I choose to behave inappropriately, I will be asked to leave the group.

3. I understand that all group communication is confidential and therefore group business cannot be discussed outside of group. Only in this way can I feel free to express my feelings.

4. I am committed to myself, and therefore to this group to learning about myself, my feelings and my behavior about relationships. I understand that growth will come from examining my thoughts, feelings and behavior in my relationships. Finally I accept the responsibility of being good to myself.

I, *Donald E. Beaty* have read the guidelines listed above and I agree to follow them as a group member.

[s]*Donald Beaty 722862*
Name
*11–15–84*
Date

I, *Lilly Epler* understand that my job as therapist is to assist *Don* with his/her growth in relationships, I am personally committed to this goal with *Donald Beaty.*

[s] *Lilly Epler*
Name
*Nov. 15, 1984*
Date

After one of the sessions had ended, some of the members, including the defendant, stood in line to wait to talk to Dr. O'Connor. When it was the defendant's turn, he told Dr. O'Connor that he had suffocated the victim. Dr. O'Connor testified:

[That] Mr. Beaty approached me and said that he did not feel that he was the terrible thing that people, meaning the group members, had accused him of being; that he did not mean to kill the little Fornoff girl; that she had become rather loud, I [believe] implicated that her mom was just outside or downstairs and that he then motioned as if to show me that he went to muffle her, keep her from screaming by muffling her by putting his hand over her face.

\* \* \* \* \* \*

Dr. O'Connor testified further:

Q. [By Mr. Thurston] And at the time that the statements were made, what room were you in out there?

A. [By Dr. O'Connor] It would be part of the physical plant called the multi-purpose room, it's a very large center area. It would be like an atrium.

Q. Approximately how long after the conclusion of the experimental research session was it that Mr. Beaty was making the statements?

A. I don't remember exactly, it would have been within minutes, could have been 15 minutes.

Q. And at the time that the statements were made, were there other persons present?

A. Oh, there were other people present.

Q. Okay. And besides yourself and Mr. Beaty, who else?

A. Probably some of the detention guards and various of the ten-people-group that tended to cluster around after the group to get our attention and ask for medication increases or whatever.

a. *Physician–Patient Privilege*

Defendant first contends that his statements to Dr. O'Connor were protected by the physician-patient privilege. The trial court admitted Dr. O'Connor's testimony by finding that no privilege existed.[1]

We do not believe under the facts in this case, that the defendant's statements to Dr. O'Connor were protected by the physician-patient privilege. In Arizona, the physician-patient privilege statute provides that:

A person shall not be examined as a witness in the following cases:

\* \* \* \* \* \*

4. A physician or surgeon, without consent of his patient, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.

A.R.S. § 13–4062(4) (1983).

The purpose of the physician-patient privilege is to insure that patients will receive the best medical treatment by encouraging full and frank disclosure of their medical history and symptoms to their doctors. *Lewin v. Jackson*, 108 Ariz. 27, 31, 492 P.2d 406, 410 (1972). To be privileged, information must be acquired by the physician in an examination or consultation with the patient under circumstances in which it is intended that the communication be private and confidential. M. UDALL & J. LIVERMORE, ARIZONA PRACTICE: LAW OF EVIDENCE § 75 at 144 (2d ed. 1982).

The statute applies only if all of its elements are met. First, the patient must not consent to the testimony. Second, the witness must be a physician or surgeon. Third, the information was imparted to the physician while he was attending the defendant. Finally, the information must be necessary to enable the physician to prescribe or act for the treatment of the defendant.

In the instant case, the defendant (patient) did not consent. Under the statute, a psychiatrist is treated as a physician. *State v. Vickers*, 129 Ariz. 506, 511, 633 P.2d 315, 320 (1981), *rev'd on other grounds, Ricketts v. Vickers*, 798 F.2d 369 (9th Cir.1986) (habeas corpus proceeding), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). Thus the first two elements have been met. We do not find,

---

1. The trial court based its decision on the exception to the physician-patient privilege in A.R.S. § 13–3620. Because we find that the privilege did not exist, we need not consider this exception.

however, that the information was given while Dr. O'Connor was attending the defendant or that the information was necessary to enable Dr. O'Connor to treat the defendant. The defendant's statements were made outside the counseling session. As Dr. O'Connor stated, "I wasn't treating Mr. Beaty in particular at that particular time. It was a group activity for all ten of the people."

■ Also, the statements were made in the presence of others. The presence of third parties can eliminate the confidential character of the interview and destroy the privilege. As we have stated:

> For information acquired by a physician to be privileged it must have been acquired under circumstances from which it appears that the examination was intended to be privileged. Cf. Wigmore on Evidence, Third Edition, Vol. VIII. para. 2381. When third persons are casually present their very presence neutralizes the confidential character of the interview and the privilege should not attach.

*State v. Thomas*, 78 Ariz. 52, 63, 275 P.2d 408, 416 (1954), *overruled in part on other grounds, State v. Pina*, 94 Ariz. 243, 383 P.2d 167 (1963).

We do not believe the physician-patient privilege (A.R.S. § 13–4062(4)) applies.

b. *Involuntariness of defendant's statement*

■ Defendant next claims his statements to Dr. O'Connor were involuntary because they were induced by a promise of confidentiality.

The defendant claims that the Interpersonal Relationships Group Contract he signed contained a promise that makes his inculpatory statements to Dr. O'Connor involuntary. He claims that he only spoke to Dr. O'Connor because he believed all his communications with the psychiatric staff were confidential. We do not agree.

The defendant's inculpatory statements were not regarding group business nor were they given during the group session. The statements were not induced or coerced by defendant's membership in the group. They were unrelated to the group sessions and were spontaneously made.

c. *Miranda Warnings*

Defendant next contends that his statements to Dr. O'Connor were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendant asserts that the statements were elicited purely for correctional or law enforcement purposes in violation of *Miranda*. Defendant contends that the use of jail psychiatrists as a source of inmate confession evidence is the type of interrogation requiring that *Miranda* warnings be given.

Defendant cites *State v. Vickers*, 129 Ariz. 506, 633 P.2d 315 (1981), *rev'd on other grounds, Ricketts v. Vickers*, 798 F.2d 369 (9th Cir.1986) (habeas corpus proceeding), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987) and *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), as support for his position. We do not believe that the cases apply. In *Vickers*, the defendant was custodially interrogated for the purpose of conducting a mental status examination. The psychologist did, however, question Vickers about the crime and obtained a confession without first advising the accused of his *Miranda* rights. The United States Supreme Court dealt with the same issue in *Estelle* in 1981. In that case, the trial court had appointed a psychiatrist to examine the defendant's competency to stand trial, and for 90 minutes the psychiatrist specifically questioned him concerning the commission of the crime itself. *Estelle*, 451 U.S. at 457, 101 S.Ct. at 1870. The Supreme Court held that the examiner's failure to advise the defendant of his *Miranda* rights precluded the use of his testimony for purposes other than to establish competency to stand trial. *Estelle*, 451 U.S. at 468, 101 S.Ct. at 1876.

■ In both of these cases, the medical person specifically questioned the accused concerning the commission of a crime. In the instant case, the defendant's statements were spontaneous and not the result

of interrogation. Statements volunteered by defendant and not prompted by the interrogation are admissible. *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630; *State v. Carter*, 145 Ariz. 101, 106, 700 P.2d 488, 493 (1985).

We believe that where the statements are entirely spontaneous, and are not solicited by questions or acts reasonably likely to elicit a confession, *Miranda* warnings are not a prerequisite for admissibility.

## 2. PGM TEST RESULTS

The state took blood samples from the defendant. From these samples, slides were made and a phosphoglucomutase (PGM) analysis was made. No photographs of the slides were taken and the slides were destroyed. The blood samples were, however, preserved and defendant's expert was provided with samples for testing. Defendant argues that since the prosecution's expert destroyed the slides from which he made a PGM analysis, and failed to photographically preserve the results of his testing procedure, exculpatory evidence in a processed form was destroyed and prevented the defendant from challenging the forensic procedure of electrophoresis. Defendant asserts that the trial court improperly denied a motion in limine to exclude testimony and test results of the identification and grouping of dried blood stains. We do not agree.

The state has an affirmative duty to preserve evidence which might be expected to play a significant role in a suspect's defense. *State v. Escalante*, 153 Ariz. 55, 60, 734 P.2d 597, 602 (App.1986) (citing *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *State v. Youngblood*, 153 Ariz. 50, 52, 734 P.2d 592, 594 (App.1986), *cert. granted, Arizona v. Youngblood*, — U.S. —, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *State v. Mitchell*, 140 Ariz. 551, 555, 683 P.2d 750, 754 (App.1984). Moreover, when such evidence can be collected and preserved by the state, failure to preserve the evidence is tantamount to prosecutorial suppression of the evidence, even though the loss of the

evidence is inadvertent and not the result of bad faith. *Escalante*, 153 Ariz. at 60, 734 P.2d at 602. Additionally, if the evidence is not preserved, the case may be dismissed. *Youngblood*, 153 Ariz. at 55, 734 P.2d at 597.

With regard to this position, the United States Supreme Court as recently as 1984 dealt with the issue of preservation of evidence in breath sample analysis test results used at trial. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

In that case, the United States Supreme Court ruled that the due process clause of the fourteenth amendment did not require that law enforcement agencies preserve breath samples in order to introduce the results at trial. *Trombetta*, 467 U.S. at 491, 104 S.Ct. at 2535.

In applying this rationale to the *slides* used to analyze semen and blood samples, under the United States Constitution, the defendant's right to analyze the samples was not abridged. Likewise, under the rules set forth in Arizona, defendant had a right to analyze the *sample*, but not necessarily the specific *slides*.

Since in the instant case the samples were frozen, retained, and delivered to the defense's expert for analysis, we believe there was no denial of due process through destruction of the slides used by the state's expert. Moreover, defendant was not denied the opportunity to impeach the state's expert or procedure, since defendant had an opportunity to independently analyze the samples and cross-examine the witness. We find no error in the trial court's denial of the motion in limine.

Defendant goes further, however, and contends that the PGM test failed to meet the test for admissibility of evidence based upon the application of a new scientific technique under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). We do not agree. PGM or blood grouping tests are a well-recognized and admissible means for identification of blood semen samples. *See generally State v. Escalante*, 153 Ariz.

55, 734 P.2d 597 (App.1986); *State v. Youngblood,* 153 Ariz. 50, 734 P.2d 592 (App.1986), cert. granted, *Arizona v. Youngblood,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *State v. Mitchell,* 140 Ariz. 551, 683 P.2d 750 (App.1984). We find no error.

### 3. WAS THE DEATH PENALTY PROPERLY IMPOSED?

 We have the duty to independently review the existence of aggravating or mitigating circumstances and to determine whether the death penalty was improperly imposed or should be reduced to life. *State v. Roscoe,* 145 Ariz. 212, 226, 700 P.2d 1312, 1326 (1984), *cert. denied, Roscoe v. Arizona,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985); *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied, Richmond v. Arizona,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). The state bears the burden of proving the existence of aggravating circumstances beyond a reasonable doubt. A.R.S. § 13–703(C); *State v. Jordan,* 126 Ariz. 283, 286, 614 P.2d 825, 828, *cert. denied, Jordan v. Arizona,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980).

Defendant was found guilty of one count of first-degree murder and one count of sexual assault. The trial judge by special verdict, A.R.S. § 13–703(D), found as an aggravating circumstance that the murder was committed in an especially cruel, heinous or depraved manner, and because he found no mitigating circumstances sufficiently substantial to outweigh this aggravating circumstance, sentenced the defendant to death.

 Defendant contends that the trial court improperly imposed the death penalty by finding the existence of the aggravating factor of a cruel, heinous, or depraved murder. A.R.S. § 13–703(F)(6) establishes as an aggravating circumstance the fact that a defendant commits a murder in an especially cruel, heinous, or depraved manner. These terms are considered disjunctive; the presence of any one of three factors is an aggravating circumstance. *State v. Correll,* 148 Ariz. 468, 480, 715 P.2d 721, 733 (1986).

### a. *Cruelty*

 Cruelty is manifested by a murder "disposed to inflict pain esp. [especially] in a wanton, insensate or vindictive manner: sadistic." *State v. Knapp,* 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), *cert. denied, Knapp v. Arizona,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Cruelty involves the pain and suffering of the victim, including any mental distress suffered prior to death. *State v. Castaneda,* 150 Ariz. 382, 393, 724 P.2d 1, 12 (1986); *State v. Bracy,* 145 Ariz. 520, 537, 703 P.2d 464, 481 (1985), *cert. denied, Bracy v. Arizona,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). Thus, to suffer pain or distress, the victim must be conscious at the time the offense is committed. If the evidence is inconclusive on consciousness, the factor of cruelty cannot exist. *State v. Gillies,* 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983), *cert. denied, Gillies v. Arizona,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). In the instant case the evidence showed that there was the presence of vomit in the girl's mouth. Surely the process of holding the victim against her will, clamping a hand over her mouth to muffle her screams, thus causing her to vomit reflects the terror and horror that must have been present in the victim's mind. We find the presence of cruelty.

### b. *Heinous and Depraved*

 A murder is especially heinous if it is "hatefully or shockingly evil." *Knapp,* 114 Ariz. at 543, 562 P.2d at 716. A murder is depraved if "marked by debasement, corruption, perversion or deterioration." *Knapp,* 114 Ariz. at 543, 562 P.2d at 716. The terms, "heinous" and "depraved," focus upon a defendant's state of mind at the time of the offense, as reflected by his words and acts. *State v. Summerlin,* 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983).

 This court has set forth five factors to determine the existence of heinous or depraved conduct:

1. relishing of the murder by the defendant;

2. the infliction of gratuitous violence on the victim beyond that necessary to kill;

3. mutilation of the victim's body;

4. the senselessness of the crime; and

5. helplessness of the victim.

*State v. Gretzler,* 135 Ariz. 42, 52–53, 659 P.2d 1, 11–12, *cert. denied, Gretzler v. Arizona,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

In finding that a killing was especially heinous or depraved, we have said:

The victim in this case is 78 years old. She had limited mental capabilities and was easily manipulated. She was helpless at the hands of appellant. He could have accomplished whatever criminal goals he desired without killing her.... We find that by sexually assaulting Winifred Duggan and senselessly killing her, knowing full well that by virtue of her advanced age and limited mental capabilities she was easy prey, appellant demonstrated a shockingly evil and corrupt state of mind.

*State v. Zaragoza,* 135 Ariz. 63, 69–70, 659 P.2d 22, 28–29, *cert. denied, Zaragoza v. Arizona,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983).

This court has also stated that in application of these standards to the rape and murder of a young girl:

Abduction, violent sexual penetration and strangulation of a helpless seven year old child are circumstances that lead to only one conclusion. The senseless killing and the entire nature of the attack are repugnant to a civilized society. The elements of a heinous crime and a depraved state of mind are present.

*State v. Roscoe,* 145 Ariz. 212, 226, 700 P.2d 1312, 1326, *cert. denied, Roscoe v. Arizona,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985). (Because the victim was helpless at the time of the attack, and the murder was by its own terms senseless, these factors contribute to a finding of heinousness and depravity.)

We believe the record supports the findings of especially heinous or depraved conduct in the case before us. Defendant senselessly killed a helpless victim, and as reprehensible as this may be, sexually assaulted her either contemporaneously with or shortly after her death.

We find that the statutory aggravating circumstances are present to uphold the propriety of the death sentence.

## 4. VICTIM IMPACT STATEMENTS

Prior to sentencing, the court received victim impact statements pursuant to a statute which reads:

F. The victim of any felony or the immediate family of the victim if the victim has died as a result of the conduct of the defendant may appear personally or by counsel at any aggravation or mitigation proceeding to present evidence and express opinions concerning the crime, the defendant or the need for restitution. The court in imposing sentence shall consider the evidence and opinions presented by the victim or the victim's immediate family at any aggravation or mitigation proceeding or in the presentence report. G. Nothing in this section shall affect any provision of law which imposes the death penalty, which expressly provides for imprisonment for life or which authorizes or restricts the granting of probation and suspending the execution of sentence.

A.R.S. § 13–702(F), (G).

In death penalty cases, the permissible aggravating circumstances which may be considered are set forth in A.R.S. § 13–703(F). The victim impact statement statute does not purport to add to that list. Victim impact statements may, nevertheless, be considered in non-death penalty cases such as sexual assault for which the defendant was found guilty in this case by the trial court prior to sentencing. Defendant contends that the trial court improperly received the victim impact statements at the sentencing phase contrary to the eighth amendment to the United States Constitution as determined by the United States Supreme Court in *Booth v. Maryland,* 482

U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). We do not agree.

In *Booth,* the defendant had been convicted of two counts of capital murder. He chose to have the jury, rather than the judge, determine his sentence under the statute that gave him the option. The Maryland statute, MD.ANN.CODE art. 41, § 4–609(c)(a) (1986), required the preparation of a victim impact statement addressing the impact of the offense on the victim's family. This document was required to be presented to the jurors during the sentencing phase of the trial either by reading the text, or by live testimony of the family members. In *Booth,* the expressions and opinions of the victim's family were read to the jurors as required by the statute. Booth was sentenced by the jurors to death on one of the two murder counts.

The United States Supreme Court, in a five to four decision, held that the personal characteristics of the victim, the emotional impact on the victim's family, and the family's opinions of the crime and defendant, were irrelevant to a capital sentencing decision. The Court further held that the admission of such evidence in a jury situation "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth,* 482 U.S. at ——, 107 S.Ct. at 2533. The Court in *Booth* reasoned that a victim impact statement could divert the jurors' attention from the defendant and the offense to the victim's family, matters probably not even considered by the defendant when he formed the decision to kill. Because this type of information is inflammatory by its very nature, the jurors might well vote for capital punishment because of the impact on the family, rather than the defendant's character or the circumstances of the crime.

The United States Supreme Court presumed that the jury in *Booth* would be adversely affected by such emotional evidence. Such a presumption does not, however, exist where the judge is the sentencer. A judge is trained in the law and is a professional decision maker. *State v. Ros-*

*si,* 154 Ariz. 245, 247, 741 P.2d 1223, 1225 (1987); *State v. Perkins,* 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984). A judge can separate the admissible from the inadmissible. For example, a trial judge sitting as the trier-of-fact can hear evidence, rule on its inadmissibility and not consider it when later making his or her decision. *State v. Cameron,* 146 Ariz. 210, 215, 704 P.2d 1355, 1360 (App.1985).

Most recently, for example, *Booth* was considered in a case in which victim impact statements were presented to a three-judge panel in its sentencing decision for capital murder. *State v. Post,* 32 Ohio St.3d 380, 383, 513 N.E.2d 754, 757 (1987), *cert. denied, Post v. Ohio,* —— U.S. ——, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988). In that case, the court noted that it indulges:

> [I]n the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary. (citations omitted).

*Post,* 32 Ohio St.3d at 383, 513 N.E.2d at 759 (citing *State v. White,* 15 Ohio St.2d 146, 151, 44 Ohio Op.2d 132, 239 N.E.2d 65, 70 (1968)).

In Arizona, it is the trial judge, not the jurors, who determines whether the penalty shall be life imprisonment or death. A.R.S. § 13–703. Absent proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors.

We do not believe that *Booth, supra,* applies. We find no error.

## 5. CONSECUTIVE SENTENCES

The trial judge, under A.R.S. § 13–708, ordered that the sentences be served consecutively, stating;

> [B]ased on the record before the court the court further finds cause exists for imposing consecutive sentencing: The defendant is a dangerous and violent person and a grave danger to society and, therefore, should be removed from society for the maximum time possible.

Defendant contends that the trial court erred in requiring that the sentences on the murder and sexual assault charges run consecutively to one another because A.R. S. § 13–604(H) bars consecutive periods of sentence enhancement for "spree" offenses that occur on the same occasion. The statute reads:

Convictions for two or more offenses not committed on the same occasion but consolidated for trial purposes may, at the discretion of the state, be counted as *prior* convictions for purposes of the section. *Convictions for two or more offenses committed on the same occasion shall be counted as only one conviction for purposes of this section.* (Emphasis added.)

A.R.S. § 13–604(H).

■ The limits articulated in the second sentence of § 13–604(H) are applicable only in determining the number of prior convictions. *State v. Noble,* 152 Ariz. 284, 285, 731 P.2d 1228, 1229 (1987). Moreover:

Section 13–604 is a "repetitive offenders" statute, and under § 13–604(N), the defendant's sentence is enhanced because he has prior convictions for serious crimes committed on multiple occasions. Thus, the focus is on the defendant's prior, rather than present, convictions.

By limiting application of the second sentence of § 13–604(H) to prior convictions, we do not intimate that convictions for presently charged offenses in a multiple-charge indictment may never be deemed prior convictions under § 13–604(H). If any of the presently charged offenses were not committed on the same occasion, they may be considered prior convictions.

*Id.* at 285–86, 731 P.2d at 1229–30.

We do not believe that § 13–604(H) applies to the sentencing in this case.

■ Defendant however contends that the double-punishment statute also prevents the imposition of consecutive sentences in this case.

The section provides:

An act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent.

A.R.S. § 13–116.

This statutory restriction precludes the trial court from ordering consecutive sentences if the offender's conduct is deemed a single act. The offender's conduct is deemed a single act if, after eliminating evidence supporting elements of one charge, remaining evidence will not support elements of the additional charges. *Noble,* 152 Ariz. at 286, 731 P.2d at 1130 (citing *State v. Griffin,* 148 Ariz. 82, 85, 713 P.2d 283, 286 (1986); *State v. Newman,* 141 Ariz. 554, 559, 688 P.2d 180, 185 (1984)).

Here, defendant was charged with first degree murder and sexual assault. Evidence showed that defendant murdered and sexually assaulted the victim. After eliminating the evidence supporting the sexual assault, sufficient evidence remained to support the murder conviction. After eliminating the elements of the murder, the sexual assault is still supportable. Because the evidence supports separate convictions, the trial judge had authority to order the sexual assault sentence to be served consecutive to the murder sentence without violating A.R.S. § 13–116.

6. DID THE TRIAL COURT ERR BY FAILING TO STATE ON RECORD OR IN ITS SPECIAL VERDICT THAT IT FOUND THE EXISTENCE OF AGGRAVATING FACTORS TO HAVE BEEN PROVEN BEYOND A REASONABLE DOUBT?

The trial court did not state on the record that it found the existence of the aggravating factors to have been proven beyond a reasonable doubt. The special verdict merely reflects that the trial court found the existence of one aggravating factor, not that the court had been convinced beyond a reasonable doubt of its existence. The defendant contends the death sentence should be vacated and the matter remanded to the trial court for further proceedings. We do not agree.

■ In *State v. Jordan,* 126 Ariz. 283, 286, 614 P.2d 825, 828, *cert. denied, Jor-*

*dan v. Arizona*, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980), this court held that the State must prove the existence of aggravating circumstances beyond a reasonable doubt. Whenever the evidence of aggravating factors is inconclusive, this court will reduce a death penalty to life imprisonment. *See, e.g., State v. Madsen*, 125 Ariz. 346, 353, 609 P.2d 1046, 1053, *cert. denied, Madsen v. Arizona*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980); *State v. Verdugo*, 112 Ariz. 288, 292, 541 P.2d 388, 392 (1975).

The trial judge, however, is not required to state on the record that he or she found the factors beyond a reasonable doubt any more than a jury must state that they found the defendant guilty beyond a reasonable doubt. As long as a jury is properly instructed, we can assume they applied the proper burden of proof. We can also assume the judge applied the proper burden. We find no error.

## 7. DEATH PENALTY STATUTE

Defendant contends that our death penalty statute, A.R.S. § 13–703, is unconstitutional.

a. *Whether the Arizona death penalty statute is unconstitutional because it fails to require the trial court to support its findings in the special verdict?*

At sentencing in the instant case, the trial court in its two and a half page "special verdict" recited its conclusions with regard to the existence or non-existence of the statutory aggravating factors. No mitigating factors were found to exist.

Defendant contends that this court should direct trial courts to fully support their findings on aggravation and mitigation in an extensive and detailed written special verdict such as the detailed special verdict rendered in *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980). The defendant states that requiring the trial court to set forth in writing its reasoning on this subject would reduce the likelihood of the death penalty being imposed in a wanton, freakish and arbitrary manner. Defendant

further contends that the capital defendant is constitutionally entitled to this, and insofar as the statute does not require this, it is unconstitutional as a denial of due process. We do not agree.

Although detailed findings might be helpful in reviewing the trial court's action in sentencing, such detailed and exhaustive findings as were made in *Ceja, supra*, are not mandated by statute or case law. The closest we have come to this is in noting that "the better practice" would be for the trial court to list all the factors considered in mitigation so that on appeal we can be certain that all mitigating factors were in fact considered. *State v. Leslie*, 147 Ariz. 38, 50, 708 P.2d 719, 731 (1985). The judge in the instant case did list all the mitigating circumstances he considered even though he found none to exist. We find no error.

b. *Whether Arizona's death penalty statute is unconstitutional because it fails to require the government to prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors?*

Defendant contends that Arizona's death penalty statute is unconstitutional because it does not require the prosecutor to prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. We have previously considered this argument and rejected it. *See State v. Schad*, 129 Ariz. 557, 574, 633 P.2d 366, 383 (1981), *cert. denied, Schad v. Arizona*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982), *rev'd on other grounds, State v. Schad*, 142 Ariz. 619, 691 P.2d 710 (1984).

c. *Whether Arizona's death penalty statute is unconstitutional because the statute mandates that a death sentence be imposed whenever one aggravating and no mitigating circumstances are found, regardless of the trial court's belief that a life sentence is warranted under the facts of the case?*

In Arizona, under A.R.S. § 13–703(E), the trial court *must* impose a

sentence of death if it finds the existence of one statutory aggravating factor and does not find the existence of any mitigating factor (or one or more mitigating circumstances substantial enough to call for leniency). A death sentence is thus required regardless of the trial court's belief that a life sentence is appropriate.

Under Section 13–703(E) if a case involves one or more of seven enumerated aggravating circumstances and no mitigating circumstances sufficiently substantial to call for leniency then the trial court is required to impose a sentence of death.

*State v. Zaragoza,* 135 Ariz. 63, 69, 659 P.2d 22, 28, *cert. denied, Zaragoza v. Arizona,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983). The statute takes the human element out of the imposition of the death penalty and in doing so supports the constitutionality of the statute. Under the statute, a defendant will stand the same chance of receiving the death penalty from a judge who does not philosophically believe in the death penalty as from a judge who does. By taking the human factor out of the sentencing process the death penalty is then reserved for those who are above the norm of first-degree murderers or whose crimes are above the norm of first-degree murders, as the legislature intended. *State v. Blazak,* 131 Ariz. 598, 604, 643 P.2d 694, 700, *cert. denied, Blazak v. Arizona,* 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). We find no error.

d. *Whether Arizona's death penalty statute is unconstitutional because inadequate standards are utilized by trial courts in balancing aggravating circumstances against mitigating circumstances?*

▇ Defendant contends that in Arizona, the death penalty is imposed wantonly, arbitrarily and freakishly because no ascertainable standards are provided to the sentencing judge to measure the relative weights to be given the aggravating and mitigating factors that have been found to exist. This issue has been rejected numerous times by this Court. *State v. Gretzler,* 135 Ariz. 42, 53–54, 659 P.2d 1, 12–13, *cert.*

*denied, Gretzler v. Arizona,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 327 (1983); *State v. Greenawalt,* 128 Ariz. 150, 175, 624 P.2d 828, 853, *cert. denied, Greenawalt v. Arizona,* 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); *State v. Mata,* 125 Ariz. 233, 241–42, 609 P.2d 48, 56–67, *cert. denied, Mata v. Arizona,* 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980). We find no error.

e. *Was appellant denied his sixth amendment right to a jury trial on the issues of the existence or non-existence of both aggravating and mitigating circumstances as well as on the issue of the propriety of a death sentence?*

▇ Defendant asserts that the sixth amendment to the United States Constitution requires that a jury trial be held on the question of the existence or non-existence of both aggravating and mitigating factors. It is further asserted that a jury trial is constitutionally required on the issue of the propriety of a death sentence.

We have previously disposed of this question. *State v. Gretzler,* 135 Ariz. 42, 56, 659 P.2d 1, 15, *cert. denied, Gretzler v. Arizona,* 461 U.S. 976, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *State v. Blazak,* 131 Ariz. 598, 602, 643 P.2d 694, 698 (1982); *State v. Schad,* 129 Ariz. 557, 574, 633 P.2d 366, 383 (1981), *cert. denied, Schad v. Arizona,* 455 U.S. 983, 102 S.Ct. 1492 (1982), *rev'd on other grounds, State v. Schad,* 142 Ariz. 619, 691 P.2d 710 (1984); *State v. Steelman,* 126 Ariz. 19, 20–21, 612 P.2d 475, 476–77, *cert. denied, Steelman v. Arizona,* 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980). This argument was also rejected by the United States Supreme Court. *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913 (1976). We find no error.

## 8. PROPORTIONALITY REVIEW

▇ We must conduct a proportionality review to determine whether imposition of death violated the eighth amendment. Our purpose in conducting a proportionality review is to determine "whether the sen-

tences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant." *State v. LaGrand,* 153 Ariz. 21, 37, 734 P.2d 563, 579, *cert. denied, LaGrand v. Arizona,* — U.S. —, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987); *State v. Bracy,* 145 Ariz. 520, 538, 703 P.2d 464, 482 (1985), *cert. denied, Bracy v. Arizona,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). A similar case is *State v. Castaneda,* 150 Ariz. 382, 724 P.2d 1 (1986), where defendant abducted and sexually assaulted two twelve-year-old boys, later killing one of the victims. This court found that the murder was committed in an especially cruel, heinous, and depraved manner and the death penalty was properly imposed. *Castaneda,* at 395, 724 P.2d at 14.

Likewise, in *State v. Roscoe,* 145 Ariz. 212, 700 P.2d 1312 (1984), *cert. denied, Roscoe v. Arizona,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985), defendant abducted, sexually assaulted and strangled a helpless seven-year-old girl. This court found that the murder was committed in a cruel, heinous and depraved manner and the death penalty was properly imposed. *Id.* 145 Ariz. at 226, 700 P.2d at 1326. We have also considered the following similar cases in which we found the death penalty properly imposed: *State v. Clabourne,* 142 Ariz. 335, 347–48, 690 P.2d 54, 66–67 (1984); *State v. Gillies,* 142 Ariz. 564, 570, 691 P.2d 655, 697 (1984), *cert. denied, Gillies v. Arizona,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *State v. Summerlin,* 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983). In each of these cases the defendant both sexually assaulted and murdered the victim, and received the death penalty based on one or more aggravating circumstances.

Additionally, we have considered cases where the death penalty was reduced to life imprisonment by this court. *See State v. Johnson,* 147 Ariz. 395, 710 P.2d 1050 (1985) (defendant did not create grave risk of danger to others or commit murder in cruel, heinous or depraved manner, and no aggravating circumstances existed); *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983) (there is a good deal of evidence which suggests the defendant and his accomplice did not intend to kill the victim because the car in which the victim was locked was left in an apartment complex where people would likely hear him in the trunk); *State v. Graham,* 135 Ariz. 209, 660 P.2d 460 (1983) (substantial mental impairment due to drug addiction, neurological problems and brain damage; vulnerability to influence; lack of prior record of violence); *State v. Valencia,* 132 Ariz. 248, 645 P.2d 239 (1982) (youth of defendant); *State v. Watson,* 129 Ariz. 60, 628 P.2d 943 (1981) (change of character and goals while in prison; youth of defendant; murder occurred as a result of shootout begun by victim); *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979) (substantial mental impairment due to brain lesion). We find that imposition of the death penalty in this case is proportional to the penalties imposed in similar cases in this state.

Neither do we find the sentence disproportionate to death sentences in other jurisdictions. The defendant's sentence is similar to sentences received by other defendants for similar crimes in other jurisdictions. *See generally State v. Morales,* 32 Ohio St.3d 252, 513 N.E.2d 267, 276–277 (1987), *cert. denied, Morales v. Ohio,* — U.S. —, 108 S.Ct. 785, 98 L.Ed.2d 871 (1988); *State v. Loyd,* 489 So.2d 898, 906 (La.1986), *stay granted,* 491 So.2d 1348 (1986), *cert. denied, Loyd v. Louisiana,* 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987); *Davis v. State,* 477 N.E.2d 889, 900–901 (Ind.1985); *Adams v. State,* 412 So.2d 850, 855–857 (Fla.1982), *cert. denied, Adams v. Florida,* 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982); *State v. Simants,* 197 Neb. 549, 566, 250 N.W.2d 881, 891, *cert. denied, Simants v. Nebraska,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977). In each of these cases the victims were children, who were either sexually assaulted or cruelly beaten during the perpetration of the crime, and the death penalty was imposed. We find, therefore, that the disposition in the instant case is not disproportionate to other sentences in capital cases involving the murder of children.

## 9. INEFFECTIVE ASSISTANCE OF COUNSEL.

■ Defendant contends he was denied effective assistance of counsel on four grounds:

(1) the failure to object to the admissibility of Dr. O'Connor's testimony on the basis that defendant's statements to him were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(2) The failure to argue that defendant's statements to Dr. O'Connor were involuntary as induced by a promise of confidentiality.

(3) The failure to place into evidence a copy of defendant's "Interpersonal Relationships Group Contract."

(4) The failure to pursue alleged juror misconduct as grounds for a mistrial.

We have stated:

In deciding whether trial counsel was ineffective and whether such ineffectiveness warrants a new trial, this court applies a two-pronged test: 1) was counsel's performance reasonable under all the circumstances, i.e. was it deficient? *State v. Nash,* 143 Ariz. 392, 694 P.2d 222 (1985) (applying to cases tried or pending on appeal on or after January 9, 1985, *State v. Gerlaugh, supra* ); and 2) was there a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different," the prejudice requirement. *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984)) (applied retroactively to cases after *State v. Watson,* 134 Ariz. 1, 653 P.2d 351 (1982)).

*State v. Salazar,* 146 Ariz. 540, 541, 707 P.2d 944, 945 (1985). In deciding an ineffectiveness claim, this court need not approach the inquiry in a specific order or address both prongs of the inquiry if the defendant makes an insufficient showing on one. *Salazar,* 146 Ariz. at 541, 707 P.2d at 945.

In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result. *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2069 (1984).

In the instant case, we deem it appropriate to apply the prejudice component first. Thus, assuming *arguendo* that counsel's performance was deficient, we examine whether there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984).

■ Considering the totality of the evidence before the jury, we do not believe counsel's alleged errors would have affected the result of the proceeding. First, the defendant's statements to Dr. O'Connor were not inadmissible due to the absence of *Miranda* warnings. Moreover, defendant was not entitled to his *Miranda* rights because, although he was in custody, he was not being interrogated by Dr. O'Connor.

■ Secondly, the evidence overwhelmingly shows that the defendant's statements to Dr. O'Connor were voluntary and were not based on the promise of confidentiality, nor were they protected by the physician-patient privilege.

■ Thirdly, the failure of defendant's counsel to introduce a copy of defendant's "Interpersonal Relationships Group Contract" was not error. Because defendant's statements were made to Dr. O'Connor outside the auspices of the group counseling session and in the presence of third persons, any rights existing under the group contract had no bearing on the admission of Dr. O'Connor's statements.

**250**

Finally, the defendant contends that counsel should have taken steps to secure the removal of a juror for misconduct during the trial. In reviewing the evidence, the trial court did consider a claim of juror misconduct, and this matter appears in the record on appeal. Moreover, the trial judge, upon agreement by both the defendant personally and his counsel, questioned the juror as to alleged comments to other persons concerning the trial. Subsequent to the procedure utilized, defense counsel requested an evidentiary hearing to introduce testimony of witnesses who would contradict the juror's statements. Upon suggestion of the trial court, defense counsel was to file affidavits of these witnesses. The affidavits were never filed.

The fact that defense counsel did not present witnesses does not establish ineffectiveness. Matters of trial strategy and tactics are committed to defense counsel's judgment, and claims of ineffective assistance cannot be predicated thereon. *State v. Vickers*, 129 Ariz. at 514, 633 P.2d at 323 (1981) (quoting *State v. Streett*, 11 Ariz. App. 211, 215, 463 P.2d 106, 110 (1969)).

A new trial is not required every time a juror has been placed in a potentially compromising situation. *State v. Garcia*, 141 Ariz. 580, 583, 688 P.2d 206, 209 (App.1984). Defendant's claim of juror misconduct is insufficient to establish that counsel was ineffective for failing to pursue a mistrial or a new trial.

Defendant has failed to show that the alleged ineffective assistance of trial counsel caused any prejudice. We need not reach the performance question. We find no error.

## IV. HOLDING

We have reviewed the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 495 (1967) and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969). We find none.

The convictions and judgments are affirmed.

GORDON, C.J., FELDMAN, V.C.J., and HOLOHAN and MOELLER, JJ., concur.