Donald Edward BEATY, Petitioner–Appellant,

v.

Terry STEWART, Director, Respondent–Appellee.

No. 00–99007.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2001.

Submission Deferred Jan. 29, 2002.

Resubmitted Aug. 15, 2002.

Filed Aug. 27, 2002.

John E. Charland, Phoenix, AZ, argued the cause for the petitioner-appellant. Jess A. Lorona, Horne Ducar Lorona & Slaton, LLP, was on the briefs.

Kent E. Cattani, Chief Counsel, Criminal Appeals Section, Phoenix, AZ, argued the cause for the respondent-appellee. Janet Napolitano, Attorney General, Jack Roberts, Assistant Attorney General, and Paul J. McMurdie, Criminal Appeals Section, were on the briefs.

Before O'SCANNLAIN, GRABER, McKEOWN, Circuit Judges.

## OPINION

O'SCANNLAIN, Circuit Judge:

In this capital habeas case, we must decide whether the admission of a confession obtained by a jail psychiatrist constitutes prejudicial error. We also consider several other claims, including whether trial counsel rendered ineffective assistance of counsel in failing to pursue allegations of juror misconduct.

### I

On May 9, 1984, thirteen-year-old Christy Ann Fornoff disappeared at a Tempe, Arizona apartment complex while making collections for her newspaper route. Donald Beaty, a maintenance person for the complex, actively assisted the police in searching for Fornoff. Although the police located her collection book near the complex, she was nowhere to be found.

In the early morning of May 11, Joseph Kapp, a tenant, encountered Beaty while throwing out his trash. Beaty told Kapp that he had found a body behind the dumpster and that he had called the police. Kapp observed the body, spoke with Beaty for a few minutes, and then returned to his apartment.

The police later arrived and determined that the body was Fornoff's. A medical examiner concluded that Fornoff had been asphyxiated by smothering and that she had been sexually assaulted, either contemporaneously with or shortly after her death. The examiner also opined that she had died within two hours of her disappearance.

The police focused their investigation upon Beaty. Vomit smeared on the body matched a substance found in Beaty's closet. The blood, semen, and hair found on the body was consistent with Beaty's. Hair found on Beaty's closet carpet, couch, bedroom, and bathroom was consistent

with Fornoff's. Fibers found on the body matched Beaty's carpet and a blanket in his bedroom. Ferret hair was found on the body; the tenant who lived in Beaty's apartment a few months prior to the murder owned a ferret.[1]

Police records showed that Beaty had called the police at 5:52 a.m. According to Kapp, he had returned to his apartment at 5:50 a.m. The timing suggested that Beaty had lied to Kapp about having called the police. The police also speculated that Beaty had moved the body after speaking with Kapp. Robert Jark drove his truck in front of the dumpster at approximately 4:50 that morning. As with Kapp, Jark was sure that a body was not visible from in front of the dumpster. However, when the police arrived, the body stuck out noticeably beyond the dumpster's edge.

Beaty told police that he was with George Lorenz, a tenant, at the time Fornoff disappeared, and that Teresa Harder, another tenant, saw them together. However, Lorenz denied being with Beaty that night, and Harder similarly denied seeing them together. Beaty also claimed that the police had searched his apartment the night Fornoff disappeared. However, the two officers who searched the complex claimed that they did not enter Beaty's apartment. Finally, the police found it suspicious that Beaty had attempted, unsuccessfully, to borrow a friend's car at 11:30 p.m. the night after Fornoff disappeared. The police speculated that Beaty wanted to borrow a car to move the body.

On May 21, 1984, Beaty was arrested and charged with Fornoff's murder and sexual assault. A day later, Dr. George O'Connor, a prison psychiatrist, met with Beaty for about an hour. O'Connor routinely met with newly admitted, high-profile inmates to determine whether they were a threat to themselves. The record does not reveal much about their conversation. O'Connor apparently inquired whether Beaty felt depressed and whether he wished to talk with someone on a regular basis. O'Connor and Beaty also discussed a medical problem Beaty was having with his foot and Beaty's family's reaction to his arrest.

After the conversation, O'Connor concluded that Beaty was not suffering from any significant psychiatric problems. Nonetheless, O'Connor decided that he would occasionally drop by and check up on him. The following day, O'Connor spoke with Beaty about his foot and arranged for him to be seen by an orthopedic doctor. The record does not reveal whether O'Connor and Beaty discussed anything other than Beaty's foot problem.

Approximately two months later, O'Connor recommended transferring Beaty from the main jail to the jail's psychiatric facility. O'Connor's supervisor approved the recommendation, and Beaty did not object to the transfer. Several factors motivated O'Connor's recommendation to transfer Beaty. First, Beaty needed space to rehabilitate his injured foot. Beaty had been confined to his cell from the time of incarceration because of several death threats from other inmates. Second, the jail's psychiatric facility offered a safer place for Beaty because it was isolated from the jail's general population. Third, Beaty was becoming increasingly agitated and depressed, perhaps because of his confinement to his cell. Indeed, Beaty underwent a hunger strike, and he also repeatedly complained that inmates were harassing him.

The record is unclear as to the nature and the extent of the treatment Beaty

---

1. It is worth noting that the owner of the ferret, Angel Bello, has a lengthy criminal record, including sexual assault convictions in 1981 and 1988. While Bello testified at Beaty's trial, the jury was not informed of his criminal history.

received while at the psychiatric unit. In any event, Beaty participated in a "counseling group" moderated by O'Connor. The group consisted of five female and five male inmates, including Beaty. The purpose of the group was to foster respect between male and female inmates by bringing them together in a small group. O'Connor described the group's purpose as "bring[ing] men and women prisoners together to explore the difficulties that they may have had in interrelating with members of the opposite sex in their personal lives." O'Connor chose Beaty for the group; while Beaty had the option of not participating, he likely would have been transferred back to the main jail if he had refused.

Beaty, along with the rest of the group participants, signed a document entitled "Interpersonal Relationships Group Contract." The document stated that any information disclosed to the group would be kept confidential. Specifically, it stated, "I understand that all group communication is confidential and therefore group business cannot be discussed outside of group. Only in this way can I feel free to express my feelings."

The group met twice a week and each session lasted between an hour and an hour-and-a-half. During these sessions, group members occasionally harassed Beaty regarding the nature of his crime. In particular, some group members called him "cold blooded."

After a few weeks, Beaty approached O'Connor at the end of a session. It was about five to ten minutes after the session had formally ended, but some of the group was still milling around. Beaty and O'Connor were conversing casually [2] when Beaty suddenly complained that the group had unfairly labeled him a "terrible thing."

He told O'Connor that he did not mean to kill Fornoff. He explained that he accidentally suffocated her when he put his hand over her mouth to muffle her screams. While O'Connor was surprised by Beaty's confession, he described the statement as an "overflow of feelings from that particular group."

O'Connor did not immediately disclose Beaty's confession to anyone, and the case proceeded to trial. The state's case rested primarily on the physical evidence tying Beaty to the crime. The state also stressed the events surrounding Beaty's discovery of the body and the fact that two witnesses discredited his alibi. Beaty, in turn, attacked the reliability of the state's physical evidence. He stressed that Kapp had been playing a "drinking game" that morning. Beaty suggested that another unknown tenant committed the murder and he faulted the police for not thoroughly investigating the other tenants. Finally, Beaty emphasized that he had actively assisted the police in searching for Fornoff the night she disappeared. On March 18, 1985, the trial court declared a mistrial after the jury deadlocked ten to two in favor of guilt.

On May 8, 1985, Beaty's second trial commenced. Two days later, O'Connor went to state court to testify in an unrelated case. While waiting to testify, O'Connor spoke casually with a detention officer. During the course of the conversation, O'Connor disclosed Beaty's confession. The prosecution quickly learned about the conversation and contacted O'Connor. O'Connor refused to testify but, after an evidentiary hearing, the trial court ordered him to do so.

During the second trial, the state presented much of the same evidence as it

---

2. Specifically, O'Connor testified that he was "not questioning Mr. Beaty particularly. It

[was] casual."

had offered at the first trial, but with the addition of O'Connor's testimony. The jury unanimously found Beaty guilty of first degree murder and sexual assault. The judge thereafter conducted a sentencing hearing without a jury. The judge imposed the death penalty after finding one aggravating circumstance and no mitigating circumstances. Specifically, the judge found that the murder was committed in an especially cruel, heinous, or depraved manner. The judge also sentenced Beaty to a consecutive twenty-eight-year term for sexual assault.

The court clerk automatically filed Beaty's notice of appeal to the Arizona Supreme Court. While his appeal was pending, Beaty filed a petition for post-conviction relief with Arizona Superior Court. The Superior Court denied the petition, and Beaty petitioned for review with the Arizona Supreme Court. The Arizona Supreme Court consolidated Beaty's direct appeal and petition for review and, on May 5, 1988, denied him any relief. *See State v. Beaty,* 158 Ariz. 232, 762 P.2d 519 (1988).

On May 20, 1988, Beaty filed a second petition for post-conviction relief, which the Superior Court dismissed; Beaty did not seek appellate review. On October 25, 1990, Beaty filed a third petition, which the Superior Court denied. Beaty sought to file a supplemental petition, but the Superior Court denied it as untimely. Beaty filed a petition for review, which the Arizona Supreme Court summarily denied on September 25, 1991. On February 6, 1992, Beaty filed a fourth petition. The Superior Court denied the petition, and Beaty did not seek appellate review.

On November 6, 1992, Beaty filed a § 2254 petition with the district court. The district court denied the petition on November 24, 1999, without conducting an evidentiary hearing. The court denied some of the claims on the merits and others as procedurally defaulted.

Beaty filed a timely notice of appeal. Beaty also filed a motion with the district court requesting a certificate of appealability ("COA") on several issues. The district court granted a certificate of probable cause ("CPC") instead of a COA.

## II

Beaty filed his § 2254 petition in November 1992, well before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Accordingly, our review is generally governed by pre-AEDPA standards. *See, e.g., Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Karis v. Calderon,* 283 F.3d 1117, 1126 n. 1 (9th Cir.2002).

■ However, AEDPA's COA requirement is applicable to Beaty's appeal. *See Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Prior to AEDPA, a petitioner had to obtain a CPC in order to appeal the denial of a habeas petition. *See, e.g., Barefoot v. Estelle,* 463 U.S. 880, 892–93, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). To obtain a CPC, a petitioner had to make a "substantial showing of the denial of a federal right." *Greenawalt v. Stewart,* 105 F.3d 1268, 1273 (9th Cir.1997) (per curiam) (internal quotation marks omitted). If the petitioner made such a showing as to at least one issue, he could appeal all of the issues in the petition. *See, e.g., Odle v. Woodford,* 238 F.3d 1084, 1086 n. 2 (9th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001).

■ Under AEDPA, a petitioner must obtain a COA rather than a CPC. *See* 28 U.S.C. § 2253(c). Unlike a CPC, a COA is granted on a claim-by-claim basis. *See, e.g., Hiivala v. Wood,* 195 F.3d 1098, 1103 (9th Cir.1999) (per curiam). A peti-

tioner must make a substantial showing of the denial of a constitutional right as to *each issue* he wishes to appeal. *See* § 2253(c); *see also Karis*, 283 F.3d at 1126. A "substantial showing" includes demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484, 120 S.Ct. 1595. Courts of Appeals lack jurisdiction to resolve the merits of any claim for which a COA is not granted. *See, e.g., Pizzuto v. Arave*, 280 F.3d 949, 951 (9th Cir.2002).

Beaty requested a COA, but the district court issued a CPC instead. The court relied upon *Fuller v. Roe*, 182 F.3d 699, 702–03 (9th Cir.1999) (per curiam), which held that AEDPA's COA requirement does not apply to petitions that were filed before AEDPA's effective date. After the district court's decision, the Supreme Court decided *Slack v. McDaniel*, 529 U.S. 473, 482, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), which overruled *Fuller* and held that the COA requirement applies to all appeals filed after AEDPA's effective date, even if the petition itself was filed pre-AEDPA.

However, *Slack* also held that a court should treat a petitioner's notice of appeal as a request for a COA for those issues raised in the opening brief. *Id.* at 483, 120 S.Ct. 1595; *Cooper v. Calderon*, 255 F.3d 1104, 1107 (9th Cir.2001); *see also* Ninth Circuit Rule 22–1(c). Therefore, we proceed to consider whether Beaty is entitled to a COA for each of the several issues that he has raised.

We first take up the claims decided by the district court on the merits, except those that concern the admission of Beaty's confession. Next, we consider the claims that the district court determined

were procedurally defaulted. Finally, we take up Beaty's claims concerning the admission of his confession.

### III

█ Beaty claims that his counsel rendered ineffective assistance in failing to pursue allegations of juror misconduct. During trial, Beaty's counsel, Michael Miller,[3] allegedly received a phone call from co-workers of juror Fred Raggett. The co-workers claimed that Raggett had told them that he was going to "get Beaty." Miller promptly notified the court.

With counsel present, the court questioned Raggett in chambers. Raggett denied making any substantive comments about the trial. Miller thereupon requested a full evidentiary hearing. In particular, Miller professed that two persons were prepared to testify about Raggett's statements. However, the court asked to see affidavits from the two persons before scheduling a full evidentiary hearing.

Miller never submitted the affidavits, and the trial proceeded. After the jury returned its verdict, Miller moved for a new trial, renewing his argument that Raggett had engaged in juror misconduct. Miller did not include any affidavits with his motion, and the court denied it.

Beaty now seeks an evidentiary hearing as to whether Miller rendered ineffective assistance in failing to pursue this matter at trial. Beaty is entitled to an evidentiary hearing if he has asserted a colorable claim for relief because he has never had the opportunity to develop a factual record on this claim. *See, e.g., Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir.1994). Based on the record before us, Beaty has not presented a colorable claim that Miller's misconduct fell below an objective

---

**3.** As a sidenote, Miller was later convicted of money-laundering drug funds and operating a prostitution ring. Needless to say, he was disbarred.

standard of reasonableness. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989). Certainly, a reasonable attorney might have abandoned a full evidentiary hearing in light of Raggett's denial. Indeed, a full evidentiary hearing risked alienating Raggett and his fellow jurors. *See, e.g., United States v. Youts,* 229 F.3d 1312, 1320 (10th Cir.2000) (concluding that counsel was not ineffective in failing to pursue juror misconduct allegations due to the concern that "singling out the juror by calling him before the judge for a separate inquiry might alienate or inflame him"); *United States v. Edwards,* 823 F.2d 111, 117 (5th Cir.1987) (explaining that counsel often forgo pursuing claims of juror misconduct out of concern of alienating the jury). The decision not to pursue an evidentiary hearing was well within the bounds of reasonable trial tactics. We therefore deny a COA on the ineffective assistance claim involving juror misconduct.

### IV

■ Beaty claims that his due process rights were violated by the admission of phosphoglucomutase ("PGM") test results.[4] The state took a blood sample from Beaty and used a portion of the sample to conduct a PGM analysis. The state did not preserve the slides containing the blood sample, nor did it photograph them. Beaty claims that without the slides or photographs of them, he was unable to defend effectively against the admission of the state's PGM test results.

However, as the Arizona Supreme Court noted, Beaty was given a portion of the blood sample used in the state's PGM analysis. *Beaty,* 762 P.2d at 528. Accordingly, Beaty had the opportunity to conduct an independent PGM analysis and to coun-

ter the state's test results. Beaty's due process rights were not violated. *See, e.g., California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Hernandez,* 109 F.3d 1450, 1455 (9th Cir.1997) (per curiam). We therefore deny a COA on the due process blood sample claim.

### V

■ Beaty contends that the state trial court impermissibly considered victim impact statements at sentencing in violation of the Sixth Amendment right to confrontation, the Eighth Amendment, and due process. Under Arizona law, the judge, and not the jury, determines the penalty in a capital case. *See* Ariz.Rev.Stat. § 13–703(C). At sentencing, the judge received nineteen letters from Fornoff's friends and family and fifty-three letters from the community at large. Almost all of the letters urged a death sentence.

■ Victim impact statements are admissible at sentencing unless their admission would be "so unduly prejudicial that it renders the sentence fundamentally unfair." *Gretzler v. Stewart,* 112 F.3d 992, 1009 (9th Cir.1997); *see also Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). When a judge, as opposed to the jury, reviews victim impact statements, we presume that the judge properly applied the law and considered only the evidence he knew to be admissible. *Gretzler,* 112 F.3d at 1009; *see also Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring v. Arizona,* 122 S.Ct. 2428 (2002). In this case, there is no evidence that the trial judge considered the victim impact statements improperly in imposing a death sen-

---

4. PGM is an enzyme found in blood and semen.

tence. We therefore deny a COA on the victim impact statement claim.

## VI

■ Beaty challenges his consecutive sentences for first-degree murder and sexual assault because the crimes were committed during a "single spree." Beaty contends, as he did with the Arizona Supreme Court, that the trial court improperly imposed consecutive sentences in violation of Arizona law. However, state claims are not cognizable in federal habeas proceedings. *See, e.g., Miller v. Vasquez,* 868 F.2d 1116, 1118–19 (9th Cir.1989). Accordingly, we must deny a COA on the consecutive-sentences claim.

## VII

■ Beaty contends that there is insufficient evidence supporting the aggravating circumstance that the murder was committed in an especially cruel, heinous, or depraved manner. *See* Ariz.Rev.Stat. § 13–703(G)(6) (formerly § 13–703(F)(6)). The presence of any of the three factors is an aggravating circumstance. *See, e.g., State v. Canez,* 202 Ariz. 133, 42 P.3d 564, 591 (2002).

Cruelty concerns the mental and physical anguish suffered by the victim. *See, e.g., State v. Lopez,* 163 Ariz. 108, 786 P.2d 959, 965 (1990). As the Arizona Supreme Court observed:

> [T]he evidence showed that there was the presence of vomit in the girl's mouth. Surely the process of holding the victim against her will, clamping a hand over her mouth to muffle her screams, thus causing her to vomit reflects the terror and horror that must have been present in the victim's mind.

*Beaty,* 762 P.2d at 529.

Certainly, a rational factfinder could find that the murder was especially cruel. *See Lewis v. Jeffers,* 497 U.S. 764, 783, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

Therefore, there is no need to consider whether there is sufficient evidence that the murder was committed in an especially heinous or depraved manner. *See, e.g., Canez,* 42 P.3d at 591. We therefore deny a COA on the aggravating circumstances insufficiency of the evidence claim.

## VIII

■ Alternatively, Beaty claims that the trial judge impermissibly failed to apply a "beyond a reasonable doubt" standard in finding the aggravating circumstance. Arizona law requires a trial judge to find aggravating circumstances beyond a reasonable doubt. *See, e.g., State v. Jordan,* 126 Ariz. 283, 614 P.2d 825, 828 (1980). In this case, the trial judge neglected to mention the burden of proof in finding the aggravating circumstance. We need not decide whether the federal Constitution requires aggravating circumstances to be found beyond a reasonable doubt. *See, e.g., Woratzeck v. Stewart,* 97 F.3d 329, 335 (9th Cir.1996) (expressly leaving this question open). "Trial judges are presumed to know the law and to apply it in making their decisions." *Walton,* 497 U.S. at 653, 110 S.Ct. 3047, *overruled on other grounds by Ring v. Arizona,* 122 S.Ct. 2428 (2002). *See also Gretzler,* 112 F.3d at 1008. Beaty has failed to muster any evidence rebutting the presumption that the trial court applied the correct burden of proof. We therefore deny a COA on the burden of proof claim.

## IX

Next, we consider the claims the district court determined were procedurally defaulted. As a preliminary matter, Beaty contends that none of his claims is procedurally defaulted because the Arizona courts conducted an independent review of the record for error.

■ Section 2254 petitioners must exhaust their federal claims before seeking habeas corpus relief. *See* 28 U.S.C. § 2254(b)(1)(A). Petitioners must fairly present their federal claims to the highest state court in order to give the "State the opportunity to pass upon and to correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865, (1995) (internal quotation marks omitted). Unexhausted claims may be procedurally defaulted. *See, e.g., Reese v. Baldwin*, 282 F.3d 1184, 1190 (9th Cir.2002). A claim is procedurally defaulted "if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). If Beaty has any unexhausted claims, he has procedurally defaulted them, because he is now time-barred under Arizona law from going back to state court. *See* Ariz. R.Crim. P. 32.2(a); *see also Stewart v. Smith*, ——U.S. ——, 122 S.Ct. 2578, 153 L.Ed.2d 762 (2002) (holding that Rule 32.2(a) is an adequate and independent procedural bar).[5]

■ Properly exhausted claims may also be procedurally defaulted. If a state court determines that a claim is procedurally barred, we are precluded from reviewing the merits of the claim if the procedural bar is adequate and independent. *See, e.g., Coleman* 501 U.S. at 749–50, 111 S.Ct. 2546. Nonetheless, we will review the merits if the petitioner can show cause and prejudice or, alternatively, a fundamental miscarriage of justice. *See, e.g., Moran v. McDaniel*, 80 F.3d 1261, 1269 (9th Cir.1996).

■ At the time of Beaty's direct appeal, the Arizona Supreme Court was charged by statute to review the record independently in all criminal cases for fundamental error. *See* Ariz.Rev.Stat. § 13–4035(B) (repealed 1995); *State v. Yslas*, 139 Ariz. 60, 676 P.2d 1118, 1121 (1984). As such, Beaty contends that the Arizona Supreme Court implicitly reviewed all of his potential federal claims on direct review. Therefore, he argues that all of his claims are properly exhausted and not procedurally defaulted. However, we rejected the identical argument in *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997), in which we held that Arizona's fundamental error review does not excuse a petitioner's failure to raise his federal claims with the Arizona Supreme Court.

Beaty also stresses that Arizona courts independently review the record in capital cases to determine "the presence or absence of aggravating and mitigating circumstances." *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478, 480 (1980) (citing *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976)).[6] The district court declined to address this argument because Beaty failed to raise it until his motion for reconsideration. *See, e.g., United States v. Navarro*, 160 F.3d 1254, 1256 (9th Cir.1998). In any event, Beaty's unexhausted and procedurally barred claims do not concern the existence of an aggravating or mitigating circumstance. Therefore, there is no need to decide whether Arizona's independent review of the record excuses exhaustion or procedural default. The district court properly rejected Beaty's arguments that his procedural default was generally excused.

---

**5.** Beaty does not contend that any of the rules's codified exceptions are applicable. *See Stewart v. Smith*, 202 Ariz. 446, 46 P.3d 1067, 1071 (2002).

**6.** This principle was later codified at Ariz.Rev. Stat. § 13–703.01.

## X

■ Beaty claims that trial counsel rendered ineffective assistance of counsel in failing to introduce mitigating evidence at sentencing. Beaty also claims that trial counsel did not adequately prepare for the sentencing phase and that counsel should have requested a mental evaluation of Beaty for sentencing purposes. Finally, Beaty claims that his appellate counsel rendered ineffective assistance in failing to raise trial counsel's ineffective assistance at the sentencing.

Beaty first raised these claims in a supplemental petition to his third petition for post-conviction relief. The Superior Court denied the supplemental petition as untimely because Beaty filed it six days after a court-imposed deadline. *See* Ariz. R.Crim. P. 32.6(d) (1991). Beaty filed a petition for review, which the Arizona Supreme Court summarily denied.

Beaty procedurally defaulted the claims raised in the supplemental petition. *See, e.g., Reese,* 282 F.3d at 1190–91. Beaty has not shown that Arizona's time bar is not adequate or independent, or that its application would result in a fundamental miscarriage of justice. We therefore deny a COA on his sentencing claims.

## XI

Beaty asserts several ineffective assistance claims that were raised in his fourth petition for post-conviction relief: Beaty contends he received ineffective assistance due to his trial counsel's (1) alleged substance abuse and other personal problems, (2) failure to request certain jury instructions regarding O'Connor's testimony, (3) failure to request a mental evaluation of Beaty for sentencing, (4) neglect in introducing mitigating evidence during sentencing, (5) failure to share the presentence report with him, (6) inappropriate comments to the media, and due to his appellate counsel's (7) failure to investigate the case adequately or to raise meritorious claims on appeal.

The Superior Court held that these seven claims were procedurally barred because they were not raised on direct review or in Beaty's first petition for post-conviction relief. The sentencing claims were indeed raised in the supplemental petition to the third petition and, as discussed above, are procedurally defaulted. The other claims are unexhausted and defaulted because Beaty did not petition for review after the Superior Court denied the fourth petition. *See, e.g., Reese,* 282 F.3d at 1190–91. We deny a COA on the ineffective assistance claims raised in Beaty's fourth petition for post-conviction relief.

## XII

■ Beaty argues that the admission of his confession was in violation of his due process right to "confidential communications." In his direct appeal, Beaty claimed that the admission of O'Connor's testimony violated Arizona's physician-patient privilege. The state argued that Beaty's confession fell within an exception to the privilege that requires physicians to report incidents of sexual abuse. In his reply brief to the Arizona Supreme Court, Beaty argued that the state's interpretation of the scope of the physician-patient privilege would implicate due process concerns in *other cases.* Specifically, Beaty argued:

As a final observation on the subject of the physician-patient privilege, Beaty would note that the arguments set forth by the State would, if carried to their logical extreme, present tremendous due process problems, particularly for child molest [sic] defendants incompetent to stand trial. In these cases, in the absence of physician-patient privilege, no lawyer could have [the] client's competence or sanity evaluated under [Arizona's competency procedures] without

exposing his client to the risk that all statements made to the examining physician would be required to be reported to the prosecution..... While *Beaty's case clearly does not involve questions of confidence* or an insanity defense, the broad abrogation of the physician-patient privilege urged by the State would cause grave problems in this area.

(Emphasis added.). Beaty never argued that *his* confession was obtained in violation of any due process right to confidentiality. Rather, he argued that a broad abrogation of the physician-patient privilege might implicate due process concerns in other cases, in particular where a defendant undergoes a competency examination. Beaty did not fairly present his due process claim to the Arizona courts. *See, e.g., Reese,* 282 F.3d at 1190–91. We therefore deny a COA on his claim that the admission of his confession violated due process.

### XIII

■■■ Beaty claims that his appellate counsel labored under a conflict of interest that adversely affected his performance. After Beaty's arrest, the court appointed Mary Wisdom of the Maricopa County Office of the Public Defender to represent him. Wisdom moved to withdraw on the basis of a conflict of interest before the start of the first trial. The court conducted an *in camera* hearing, granted Wisdom's motion, and appointed Miller. The state trial record does not reveal the nature of the conflict.

The trial judge later appointed Edward McGee of the same public defender's office to represent Beaty on direct appeal. In his third post-conviction petition, Beaty claimed that McGee labored under a conflict of interest. In the event Beaty secured a new trial, he intended to call Wisdom as a witness. He expected that Wisdom would testify that the trial testimony of several of the state's witnesses was inconsistent with pre-trial statements made to the defense. According to Beaty, McGee labored under a conflict because he hoped to secure a trial in which his colleague likely would be a witness. The Superior Court denied relief, and the Arizona Supreme Court summarily denied his petition for review.

In his § 2254 petition, Beaty alleges that McGee labored under a conflict of interest. However, Beaty's characterization of McGee's conflict is vastly different from what he presented to the Arizona state courts. Wisdom apparently moved to withdraw because the public defender's office had represented a tenant, who lived in the same apartment complex as Beaty's, on child molestation charges in 1977. Wisdom did not feel she could represent Beaty because a potential defense was to implicate the tenant as an alternative suspect.

According to McGee, he contacted Miller before representing Beaty on appeal. McGee claims Miller told him that he made a tactical decision not to implicate the tenant. Because the defense was not used at trial, McGee thought the public defender's office no longer had a conflict.

According to Beaty, Miller was not aware of the tenant's criminal history. Beaty maintains that McGee labored under a conflict because he was inhibited from arguing that Miller was ineffective in not implicating the tenant. In other words, McGee could not implicate the tenant because the public defender's office had represented the tenant on child molestation charges. Beaty maintains that he is at the very least entitled to an evidentiary hearing on this claim.

■■■ However, Beaty did not fairly present this version of his conflict of interest claim to the Arizona state courts. While new factual allegations do not ordinarily render a claim unexhausted, a petitioner may not "fundamentally alter the legal claim already considered by the state

courts." *Vasquez v. Hillery,* 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). *See also Chacon v. Wood,* 36 F.3d 1459, 1468 (9th Cir.1994). Beaty's claim raised in state court is altogether different from the claim asserted in his petition. We therefore deny a COA on his conflict of interest claim.[7]

## XIV

Beaty claims that his trial counsel further rendered ineffective assistance of counsel in failing (1) to call potential alibi witnesses, (2) to object to certain parts of O'Connor's testimony, (3) and to call Beaty to testify about O'Connor's testimony. Beaty also asserts various challenges to the constitutionality of Arizona's capital punishment scheme. Beaty concedes that he did not raise these claims in state court. Accordingly, the claims are unexhausted and procedurally defaulted. *See, e.g., Reese,* 282 F.3d at 1190–91. We therefore deny a COA as to these defaulted ineffective assistance of counsel claims.

## XV

■ Beaty also argues that the district court did not afford him an adequate opportunity to show cause and prejudice to excuse procedural default. In its summary judgment motion, the state argued that several of Beaty's claims were procedurally defaulted. In his opposition and cross-motion for summary judgment, Beaty argued that his procedural default was excused because Arizona courts conduct an independent review of the record for error. Beaty did not argue cause and prejudice. Indeed, he specifically stated, "Petitioner does not need to show cause and preju-

dice." Beaty filed a motion for evidentiary hearing along with his opposition and cross-motion for summary judgment.

After briefing on the summary judgment motions was completed, the district court issued an order deferring ruling on Beaty's motion for an evidentiary hearing. The court stated: "After the Court has ruled on whether any of Petitioner's claims are procedurally defaulted *and after submitting any cause and prejudice briefs, if needed,* the Court will review the matter and determine whether a formal hearing is required . . . ." (emphasis added).

The court later granted the state's motion for summary judgment, concluding that several of Beaty's claims were procedurally defaulted. Beaty moved for a new trial, arguing that he could show cause and prejudice. The court rejected Beaty's attempt as belated.

Beaty contends that he relied on the evidentiary hearing order, which suggested that the court would entertain cause and prejudice briefs. We are not persuaded. By the time the district court had issued the order, Beaty had opposed summary judgment solely on the ground that Arizona's independent review of the record excused his default. In his motion, he expressly disclaimed any reliance upon cause and prejudice. We are satisfied that the district court did not err in denying Beaty's belated attempt to argue cause and prejudice. *See, e.g., Navarro,* 160 F.3d at 1256; *Backlund v. Barnhart,* 778 F.2d 1386, 1388 (9th Cir.1985).

7. Beaty appears to have abandoned his claim raised in state court that McGee labored under a conflict because he hoped to secure a new trial in which Wisdom likely would be a witness. In any event, Beaty's claim is without merit. Beaty has not shown that McGee labored under an "actual conflict." Specifi-

cally, Beaty has not demonstrated how these circumstances inhibited McGee from zealously advocating the award of a new trial. *See, e.g., Mickens v. Taylor,* 535 U.S. 162, ——, 122 S.Ct. 1237, 1243, 152 L.Ed.2d 291 (2002); *Bonin v. Calderon,* 59 F.3d 815, 826 (9th Cir.1995).

## XVI

We now take up Beaty's claims concerning his confession that the district court considered on the merits.

### A

■ First, Beaty argues that he was entitled to *Miranda* warnings prior to his confession. To be entitled to such warnings, two factors must be established: custody and interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The facts developed at the state admissibility hearing clearly support the Arizona Supreme Court's finding that Beaty's confession did not result from "interrogation," but was, instead, spontaneous. *See Beaty*, 762 P.2d at 528. O'Connor testified that he was "not questioning Mr. Beaty particularly. It [was] casual." Indeed, Beaty made the statement after the session had ended, and O'Connor testified that it came "more or less out of the blue" and was "somewhat shock[ing]." We are firmly convinced that O'Connor neither questioned Beaty nor engaged in the functional equivalent.[8] We therefore do not reach the question of whether Beaty was in custody at the time of confession, and deny a COA on the *Miranda* claim.

### B

■ Beaty further claims that the admission of O'Connor's testimony violates his Sixth Amendment right to counsel. The Sixth Amendment right to counsel attaches at the initiation of adversary judicial criminal proceedings. *See, e.g., United States v. Harrison*, 213 F.3d 1206, 1209

(9th Cir.2000). Once the right to counsel has attached, the state may not take actions "designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). *See also Cahill v. Rushen*, 678 F.2d 791, 793 (9th Cir.1982). This inquiry is objective and does not focus on the subjective intentions of the state officer. *See United States v. Harris*, 738 F.2d 1068, 1071 (9th Cir.1984).

■ The factual record clearly reveals that the group sessions were not deliberately designed to elicit incriminating remarks. The purpose of the group was to explore interaction between male and female inmates. The group was not organized to collect incriminating information to be used at trial. *See Brooks v. Kincheloe*, 848 F.2d 940, 945 (9th Cir. 1988). The Sixth Amendment is violated only by deliberate action, not "whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. 2616.[9]

■ Alternatively, Beaty argues that his confession occurred during a "critical stage." Once the right to counsel has attached, a defendant has the right to have counsel present for all "critical stages of the prosecution." *United States v. Akins*, 276 F.3d 1141, 1146 (9th Cir.2002). A "critical stage" is a "trial-like confrontation," *United States v. Montgomery*, 150 F.3d 983, 994 (9th Cir.1998), in which "potential substantial prejudice to [the] defendant's rights inheres" and in which counsel

---

**8.** While Beaty contends that he is entitled to an evidentiary hearing, he has not shown with any specificity that the factual record is inadequately developed to assess whether he was interrogated. *See, e.g., Phillips v. Woodford*, 267 F.3d 966, 972 (9th Cir.2001) (holding that an evidentiary hearing is not required when the petitioner relies solely upon "conclusory,

unsworn statements unsupported by any proof or offer or proof").

**9.** While Beaty did not receive an evidentiary hearing on this claim, he has not shown with any specificity that the factual record is not fully developed on this issue. *See Phillips*, 267 F.3d at 972.

may help avoid that prejudice, *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Examples of critical stages include post-indictment police lineups, *id.,* arraignment, *Hamilton v. Alabama,* 368 U.S. 52, 53, 82 S.Ct. 157, 7 L.Ed.2d 114, (1961), and sentencing, *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

■■■ We have little trouble concluding that Beaty's confession did not occur during a "critical stage." The group sessions were not court-ordered and were not designed to acquire information to be used at trial. *See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (holding that Sixth Amendment was violated by admissions made to state psychiatrist because the court ordered the sessions to determine competency). In short, the sessions were not a "trial-like confrontation." We therefore deny a COA on the claim that the admission of the confession violates the Sixth Amendment.

## C

■■■ Finally, Beaty claims that his confession was involuntary under the Fifth Amendment. The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. *See also Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The Fifth Amendment protects against involuntary statements obtained by state coercion. *See, e.g., Rogers v. Richmond,* 365 U.S. 534, 540–41, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Voluntariness is considered in light of the totality of the circumstances. *See, e.g., Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Specifically, we consider whether "the government obtained the statement by physical or psychological coercion or by improper

inducement so that the suspect's will was overborne." *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir. 1988). *See also Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (per curiam).

Beaty primarily argues that his confession was involuntary because he signed a confidentiality agreement, which promised that "all group communication" would be kept confidential. In particular, Beaty claims that *Pens v. Bail,* 902 F.2d 1464 (9th Cir.1990) (per curiam) presents materially identical circumstances. In *Pens,* the petitioner was convicted of rape and committed to the custody of a state hospital for "sexual psychopath treatment." *Id.* at 1465. The petitioner was required to divulge his past sexual history as part of the program. However, the hospital promised that any information disclosed during treatment would remain confidential. The petitioner confessed to new sex crimes during treatment, which the hospital disclosed to the court. The court thereafter sentenced the petitioner to an extended period of imprisonment, in part because of the petitioner's confessions of past criminal sexual activity. We held that the petitioner's confessions were obtained involuntarily because he was required to divulge his past criminal history under the promise that any disclosures would remain confidential. *Id.* at 1465–66. *Pens* is consistent with several decisions from our court, as well as our sister circuits. *See, e.g., United States v. Walton,* 10 F.3d 1024, 1031 (3d Cir.1993) (holding that the defendant's statement was involuntary because federal officer made a direct promise of confidentiality); *United States v. Harrington,* 923 F.2d 1371, 1377 (9th Cir.1991) (holding that the defendant's statement was involuntary because it was made during a court ordered mental examination and a state statute provided that such statements would remain confidential); *United States v. Robinson,* 439 F.2d 553,

560 (D.C.Cir.1970) (holding involuntary a confession obtained by prison psychologist because the defendant reasonably understood that his communications would remain confidential).

The state argues that *Pens* is inapposite because Beaty's statements did not fall within the scope of the confidentiality agreement. The agreement stated that "*group communication* is confidential and therefore *group business* cannot be discussed outside of group." (emphasis added). The state argues that Beaty's confession did not concern "group communication" or "business" because the statements were unrelated to the topic of group discussion. *See Beaty*, 762 P.2d at 528 ("The defendant's inculpatory statements were not regarding group business...."). Alternatively, the state asserts that the agreement did not cover Beaty's confession because he confessed after the group session had formally ended. *See id.* ("The defendant's inculpatory statements were not ... given during the group session.").

■ The critical question before us is whether Beaty reasonably believed that his statements were protected by the state's confidentiality agreement. *See, e.g., Walton*, 10 F.3d at 1029; *United States v. Cahill*, 920 F.2d 421, 427 (7th Cir.1990); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1139 (5th Cir.1988); *United States v. Shears*, 762 F.2d 397, 402 (4th Cir.1985). However, the factual record is not adequately developed for us to assess this question with any confidence. We must therefore remand to the district court for an evidentiary hearing to determine the reasonableness of Beaty's asserted belief that his statements were protected by the terms of the agreement, taking into account the circumstances surrounding Beaty's statements to O'Connor and the group discussion preceding this encounter.

■ The state, however, contends that Beaty had an opportunity to develop the factual record in state court and therefore may not obtain an evidentiary hearing without a showing of cause and prejudice. *See, e.g., Keeney v. Tamayo–Reyes*, 504 U.S. 1, 7–8, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). The pre-AEDPA standard for obtaining an evidentiary hearing is a "reasonably low threshold for habeas petitioners to meet." *Phillips*, 267 F.3d at 973. A petitioner is entitled to an evidentiary hearing if he asserts a colorable claim and a state court did not offer a "full and fair hearing" on the claim. *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *see also Phillips*, 267 F.3d at 973.

■ The state trial court conducted an evidentiary hearing as to the admissibility of Beaty's confession. However, at the beginning of the hearing, the judge seemed to limit the scope of the hearing to the question whether the confession fell within Arizona's physician-patient privilege. As the prosecutor was exploring the initial contact O'Connor had with Beaty, the judge interrupted, saying,

> I think maybe we're wasting a lot of time, because I think ... probably the primary controlling issue I think we ought to resolve first is the applicability or inapplicability of [the privilege].... If I rule that ... there is no privilege, then it doesn't make any difference what the practical background is.

At the conclusion of the hearing, the judge ruled that the privilege was inapplicable, but failed to address Beaty's contention that the statement was involuntary.[10]

---

10. The record is clear that Beaty indeed raised a Fifth Amendment involuntariness claim at the hearing. While Beaty's motion in limine focused on the state privilege issue, Beaty expressly adopted the arguments made by Dr. O'Connor, who was represented by

Under these circumstances, we are left with a genuine doubt whether the state court afforded Beaty an adequate opportunity to explore the factual underpinnings of his Fifth Amendment claim. *See, e.g., Townsend,* 372 U.S. at 313, 83 S.Ct. 745; *Rhoden v. Rowland,* 10 F.3d 1457, 1460 (9th Cir.1993). Notably, the facts relevant to whether the confession falls within Arizona's physician patient privilege are not necessarily the same as the facts relevant to his Fifth Amendment claim.

In light of the grave consequences at stake, we must conclude that an evidentiary hearing on this issue before the district court is necessary.[11] We also leave for the district court consideration of whether any error was prejudicial under *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).[12]

## XVII

In conclusion, we deny a certificate of appealability on all claims except as to the voluntariness of Beaty's confession; we remand to the district court for an evidentiary hearing limited to such claim. Any appeal from the disposition of the evidentiary hearing shall be assigned to this panel.

separate counsel. Dr. O'Connor opposed testifying on the ground that the confession was obtained involuntarily under the Fifth Amendment.

11. While Beaty primarily relies upon the confidentiality agreement, he also stresses that he was coerced by his fellow group members and that he was forced to participate in the sessions. In light of our remand, we decline to address these arguments at this time.

12. Beaty argues that Arizona's capital sentencing scheme is unconstitutional under the

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

rule announced in *Ring v. Arizona,* 122 S.Ct. 2428 (2002). This court has not yet decided whether *Ring* applies retroactively to habeas proceedings. We need not decide that question here because we are remanding for an evidentiary hearing concerning the voluntariness of Beaty's confession, which was admitted at the guilt phase of the trial. Thus, we may not need to reach the *Ring* question. However, if Beaty does not prevail on remand, the *Ring* issue is preserved for our future consideration.