# United States Court of Appeals
## For the First Circuit

No. 09-1522

ALBERTO TORRES,

Petitioner, Appellant,

v.

KATHLEEN DENNEHY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,

Torruella and Boudin, Circuit Judges.

John M. Thompson with whom Thompson & Thompson, P.C. was on brief for petitioner, appellant.
Natalie S. Monroe, Assistant Attorney General, Criminal Bureau, with whom Martha Coakley, Attorney General, was on brief for respondent, appellee.

July 27, 2010

**BOUDIN**, <u>Circuit Judge</u>.  Alberto Torres was indicted for murder in Massachusetts Superior Court in May 1997 for causing the death of his girlfriend's fifteen-month-old child in October 1996 and for charges growing out of the alleged abuse of her two other children.  An autopsy of the deceased child revealed a weeks-old broken leg; bruising over most of his body; and significant internal injuries, including a tear of the small intestine likely caused by a single blow "of massive force" roughly twelve hours before his death.  Torres was tried by a jury, found guilty of murder and sentenced to life imprisonment in April 1999.

After his state appeals proved unsuccessful, Torres filed this petition for habeas corpus in which he claims, first, that police deliberately elicited statements from him in violation of the Sixth Amendment, and, second, that his counsel was ineffective for not raising this objection at trial.  To place the objections in context we describe very briefly the evidence at trial and the events bearing on the statements that Torres says were improperly obtained.

The government's trial evidence consisted primarily of testimony from Torres' neighbors, forensic evidence and statements by Torres himself.  Multiple neighbors testified that they had often seen Torres and his girlfriend, Susan Fappiano, abuse the children, but that Fappiano had never done so with the fifteen-month-old, who was described as her "favorite."  One neighbor reported seeing

-2-

Torres throw the baby against a couch, and another testified that on the day the baby died, Torres picked him and shook him while yelling "shut up." Police responded to a 911 call from Fappiano later that day and found Torres holding the baby, by then lifeless.

At the scene, the police asked both Torres and his girlfriend for an explanation of bruising on the child. Fappiano told them that the baby had fallen out of his stroller, and Torres nodded in agreement; but when Torres was again asked what had happened, he stated that he had done nothing wrong and attempted to walk away. Later that night, Torres again denied any wrongdoing, telling police that neither he nor Fappiano ever struck their children, aside from Fappiano's occasional "slap [on] their hands."

This story changed in subsequent meetings with the police. Roughly a week after the 911 call, Torres met with the police and, when told that Fappiano had blamed him for the child's death, told them that Fappiano had "abused the kids." Two days later, Torres again met with the police and now stated that he had seen Fappiano strike her children "quite a few times," acknowledging that he had lied about this in earlier statements. Throughout these meetings, Torres continued to deny any wrongdoing and to offer innocuous explanations for some of the baby's more serious injuries, saying, for example, that the baby had broken his leg by falling off a couch.

An additional set of statements--those central to the present appeal--were given by Torres to the police after he was indicted in May 1997.  At that time, Torres was in jail on charges unrelated to this case.  Instead of having the sheriff serve the indictment on Torres--apparently the normal procedure, Mass. Gen. Laws ch. 277 § 65 (2010)--the prosecutor sent two troopers, Barry O'Brien and Andrew Bzdel.  O'Brien was the lead investigator in the case, and Bzdel had interviewed and taken statements from Torres during the initial investigation into the child's death in October 1996.

The prosecutor instructed the two troopers that Torres was represented by counsel and that they should not question him, but did not inform Torres' lawyer of the indictment or that it would be delivered directly to Torres.  Torres had been assigned counsel in connection with the grand jury proceedings relating to the death of the baby and the abuse of the other two children, and it was anticipated that the same lawyer would be assigned to represent him once he was charged with those offenses.

The two troopers met with Torres in jail; explained to him that he had been indicted and that they had a warrant for his arrest on those indictments; and, knowing that Torres could understand English but could not read it, read the indictments to him out loud. The Supreme Judicial Court of Massachusetts ("SJC"), described the remainder of this interaction as follows:

-4-

> After hearing just the first indictment, the
> defendant interrupted, saying that he had not
> hit any of the children. The trooper told him
> to stop, and the trooper resumed the reading of
> the remaining indictments. The defendant
> interrupted again. At that point . . . the
> trooper read the defendant his Miranda
> warnings. Beyond the standard warnings, the
> trooper also told the defendant that he knew
> the defendant had a lawyer and that he (the
> defendant) should not say anything about the
> new charges. The defendant replied that his
> lawyer had told him there was nothing to worry
> about, and that he wanted to speak to the
> officers. The trooper asked him whether he
> really wanted to do so, reminding him of the
> rights that had been read to him and that he
> already had a lawyer. The defendant insisted
> that he wanted to talk. The trooper then read
> the defendant his Miranda rights a second time,
> and the defendant acknowledged that he
> understood each of those rights. The defendant
> then gave a statement, the contents of which
> were introduced at trial.

Commonwealth v. Torres, 813 N.E.2d 1261, 1276-77 (Mass. 2004)
(footnotes omitted). During this conversation, Torres told the
police that Fappiano "must have" killed the child, but he refused to
reduce his statement to writing, saying his lawyer had advised
against it. Torres eventually told the troopers that he wanted to
speak with his lawyer, and the conversation ended.

As Torres was being prepared to return to his cell, he
gestured to Bzdel and asked him to come over. Torres then said,
contrary to earlier statements, that he had seen Fappiano kill the
baby; Bzdel asked what Fappiano had done, but Torres responded that
he could not tell him. Later that afternoon, Torres asked to speak

-5-

with a correctional officer and told the officer that Fappiano had "kicked [the baby] repeatedly" before his death--a description that conflicted with forensic evidence.

Torres was found guilty at trial and sentenced to life imprisonment, his May 1997 statements being introduced against him at trial to show evidence of a joint venture with Fappiano and consciousness of guilt. He filed a notice of appeal and thereafter unsuccessfully moved for a new trial, asserting for the first time that his May 1997 statements were taken in violation of his Sixth Amendment right to counsel because the troopers, knowing that he had an attorney, visited him at jail in hopes that he would make inculpatory statements.

The Sixth Amendment guarantees criminal defendants the right to counsel once formal criminal proceedings have begun, see Moran v. Burbine, 475 U.S. 412, 428 (1986); from that point forward, government agents may not "deliberately and designedly set out to elicit information" from a defendant represented by counsel, Brewer v. Williams, 430 U.S. 387, 399 (1977); see also Massiah v. United States, 377 U.S. 201, 205-06 (1964). However, "[t]he defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." Montejo v. Louisiana, 129 S. Ct. 2079, 2085 (2009); see also Michigan v. Harvey, 494 U.S. 344, 352 (1990).

-6-

The SJC affirmed both Torres' conviction and the denial of his motion for a new trial, holding among other things that the record failed to show that the troopers had deliberately attempted to elicit statements from him in violation of the Sixth Amendment. Torres, 813 N.E.2d at 1278. On October 19, 2005, Torres filed a petition for habeas corpus in federal district court in which he asserted the Sixth Amendment and inadequate assistance claims, along with an attack on the evidence and a Confrontation Clause claim.

The district court entered summary judgment against Torres on his deliberate elicitation and ineffective assistance claims, concluding that while various interpretations of the record might be possible, the SJC's findings were adequately supported and reasonable. Torres v. Dennehy, No. 05-30226, slip op. at 14-15, 22 (D. Mass. Jan. 4, 2008). The district court denied reconsideration but certified appealability as to all claims except the attack on the evidence and entered final judgment denying the habeas petition. On this appeal, Torres presses only the deliberate elicitation and ineffective assistance claims.

We review the district court de novo, Forsyth v. Spencer, 595 F.3d 81, 84 (1st Cir. 2010); but the governing habeas statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides that state courts' factual findings are presumed correct absent clear and convincing evidence to the

contrary, 28 U.S.C. § 2254(e)(1) (2006),[1] and that their dispositions of federal law are to be set aside only when "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," id. § 2254(d)(1).

A state court decision is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts," and it is an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [defendant's] case." Thaler v. Haynes, 130 S. Ct. 1171, 1174 (2010) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).

Torres first takes issue with the SJC's conclusion--factual, he says--that the troopers did not "deliberately elicit" information from him when visiting him in jail on May 31, 1997. Torres' claim--which at times bleeds into a legal argument, addressed later--is that the troopers' visit to read the indictment,

---

[1]Section 2254(e)(1) states that "determinations of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"; section 2254(d)(2) of the AEDPA states that a petition alleging factual error will be granted only if the state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

rather than having the sheriff do so, shows that the government intended to elicit testimony from him.  The district court concluded that this argument "boils down to an ardent presentation of one version of what might conceivably have happened on May 31, 1997." Torres, No. 05-30226, slip op. at 14.

While Torres presents an arguable interpretation of the facts, the SJC found otherwise and provided adequate support for its position.  In particular, the SJC stated that

> [w]hatever suspicions the defendant might have on that subject, the motion judge's findings with respect to what the troopers actually said to the defendant once they got to the jail would belie the defendant's theory--if their intention and hope had been that reading the indictments out loud would prompt the defendant to start making a statement, they would not have cut off his attempt to do so during the reading of the indictments, nor would they have advised him against speaking to them when he did so a second time, nor would they have suggested that he speak instead with his lawyer.

Torres, 813 N.E.2d at 1278.  Torres' counter-arguments do not show that the state courts' determination of the facts was unreasonable. See Wood v. Allen, 130 S. Ct. 841, 849 (2010) (quoting Taylor, 529 U.S. at 410-11).

Torres makes two collateral arguments, the first of which is that the SJC should not have relied on the motion judge's findings of fact because they were made in the context of a Fifth rather than Sixth Amendment claim.  But this context did not alter the historical facts found by the motion judge as to the progression

-9-

of the conversation and conclusions that Torres spoke "spontaneously and over the objection of Sergeant O'Brien," and the SJC was entitled to rely upon those findings in reaching its own conclusion. See Marshall v. Lonberger, 459 U.S. 422, 435 (1983); Teti v. Bender, 507 F.3d 50, 59 (1st Cir. 2007), cert. denied, 552 U.S. 1287 (2008).

Torres' second, related argument is that the district court should have made supplemental findings of fact because, he says, the SJC's findings "focus[ed] almost exclusively on what transpired after the officers already initiated a conversation with Mr. Torres" when (Torres asserts) other evidence makes clear that the troopers knowingly exploited their opportunity to read the indictments to Torres. Torres insists that "uncontradicted testimony" supports his argument, but he does not point to any particular statements about events prior to that conversation.

Probably the strongest version of this argument would be to say that the prosecutor's choice of the troopers rather than the sheriff to read the indictment must have been intended to elicit statements. But there is no direct proof of this and, as noted, the troopers' repeated warnings to Torres were at odds with any supposed effort to elicit statements. So there is no need to consider whether, even if the prosecutor hoped to elicit statements, the

-10-

causation chain was broken by the troopers' self-restraint in the interview.[2]

Torres' next set of arguments assert something closer to legal error, namely, that the SJC decision conflicts with Supreme Court decisions on elicitation under the Massiah and Brewer line of cases and so is contrary to, and an unreasonable application of, clearly established federal law.  In particular, he argues that the troopers' action should be condemned under an objective standard even if they lacked a subjective intent to elicit statements.  The government says that the objective-test argument was not made below but that the troopers' conduct passes that test as well.

Brewer neither supports an objective standard nor has any resemblance to our case.  There the Supreme Court found that the officer "deliberately and designedly set out to elicit information" from the defendant, 430 U.S. at 399, urging him to "[j]ust think about" the fact that a girl he had been indicted for murdering would never receive a proper burial given that winter was approaching.  Id. at 393.  The Court went on to quote the officer's testimony at

---

[2]The circumstances are less suspicious than they might appear. There is some indication in the record that the prosecutor was concerned that Torres might be released before he was formally detained under the new indictment, which entailed prompt delivery of the indictment most easily accomplished by direction to the troopers; and, as for reading rather than mere delivery of the indictment, Torres apparently could not read English even though he understood it.

-11-

trial that he had hoped to get the very admission he secured.  Id. at 399.

Torres also relies on Fellers v. United States, 540 U.S. 519 (2004).  There, officers--who arrived to arrest Fellers after he had been indicted on drug charges--said that they wanted to discuss with him his involvement in drug dealing and association with certain co-conspirators; and the defendant made incriminating statements in response.  The Supreme Court held that "there is no question that the officers . . . 'deliberately elicited' information . . . .  Indeed, the officers . . . informed him that their purpose in coming was to discuss his involvement in the [crimes]."  Id. at 524.

The equating of deliberate elicitation with "purpose" in Fellers pretty clearly suggests a concern with subjective intent of the officers; and the case is certainly distinguishable on its facts.  The troopers did not ask Torres for information and in fact told Torres not to interrupt the reading of the indictment and reminded him that he had a lawyer.  It was Torres who nevertheless insisted that he wanted to talk.  Thus the SJC's decision is neither "contrary to" nor an "unreasonable application" of Fellers or Brewer.  Taylor, 529 U.S. at 412-13.

Finally, one phrase in United States v. Henry, 447 U.S. 264, 274 (1980), could be read to invoke an objective standard, the Court saying tersely that police may cause a violation of Sixth

-12-

Amendment rights by "intentionally creating a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel."  Although one circuit court has endorsed an objective standard, Beaty v. Stewart, 303 F.3d 975, 991 (9th Cir. 2002), cert. denied, 538 U.S. 1053 (2003), this single sentence in Henry is far from clear: it could be taken to mean that the police, having deliberately created a situation, could be inferred to have intended the obvious consequences.

In fact, Henry, like Maine v. Moulton, 474 U.S. 159 (1985), involved the deliberate use of informants to elicit information from a defendant represented by counsel.  474 U.S. at 161, 176-77; 447 U.S. at 270-71.  Thus, like the other Supreme Court cases, Henry and Moulton involved deliberate elicitation.  At best, the Supreme Court's standard "remains somewhat unclear,"  LaFave et al., Criminal Procedure § 6.4(g), at 691 (3d ed. 2007), so the SJC's reading is neither in direct conflict with nor an unreasonable application of Supreme Court precedent.

Even if an objective standard governed, we could hardly conclude that reading an indictment to a defendant is (in Henry's terms) "likely to induce," 447 U.S. at 274, a defendant to make incriminating statements, any more than making an arrest is likely to do so.  This is especially so where, as here, the "situation," id., includes statements by the officers telling the defendant not to interrupt their reading of the indictment and warnings that he

was represented by counsel and should not say anything about the new charges in the indictment.

Because the elicitation issue was resolved on the merits against Torres, it does not matter whether counsel ought to have raised it earlier, and his ineffective assistance of counsel claim fails.  Similarly, we need not reach Torres' argument that his Miranda waiver--given during the interview with the troopers--was invalid since it depends on the assumption that interview was itself a Sixth Amendment violation.

The district court's judgment is affirmed.